UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KENNEDY LEWIS PARTNERS MASTER FUND LP AND KENNEDY LEWIS PARTNERS MASTER FUND II LP, | Civil Action No.: _____ |
| Plaintiffs, v. | **COMPLAINT** |
| ABRY PARTNERS, LLC, APEX CREDIT PARTNERS, LLC, CIFC ASSET MANAGEMENT LLC, ELLINGTON MANAGEMENT GROUP, L.L.C., TRIMARAN ADVISORS MANAGEMENT, L.L.C., AND WILMINGTON SAVINGS FUND SOCIETY, FSB, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Kennedy Lewis Partners Master Fund LP and Kennedy Lewis Partners Master Fund II LP (collectively, the "Plaintiffs" or "Kennedy Lewis"), by and through their undersigned counsel, for their complaint against Abry Partners, LLC ("Abry"), Apex Credit Partners, LLC ("Apex"), CIFC Asset Management LLC, for and on behalf of funds and accounts managed and/or advised by it ("CIFC"), Ellington Management Group, L.L.C., on behalf of certain funds and accounts ("Ellington"), Trimaran Advisors Management, L.L.C., as investment manager ("Trimaran", and collectively with Abry, Apex, CIFC, and Ellington, the "Lender Defendants"), and Wilmington Savings Fund Society, FSB, as Administrative Agent and Collateral Agent under the Credit Agreement and Security Agreement (defined below) ("Agent", and collectively with the Lenders Defendants, the "Defendants") allege as follows:

**INTRODUCTION**

1. This action arises out of secured loans provided by a group of lenders (the "Syndicate Lenders") to Town Sports International, LLC (the "Borrower") pursuant to various

loan and security agreements. The Borrower, through its subsidiaries, owned and operated health and fitness clubs located primarily in the Northeast and Mid-Atlantic regions of the United States. The Plaintiffs and the Lender Defendants are among the Syndicate Lenders.

2. As a result of the COVID-19 pandemic, all of the Borrower's health and fitness clubs were forced to close in March 2020, immediately halting the Borrower's business and leaving the Borrower without a source of revenue to fund its operations and repay the money borrowed from the Syndicate Lenders. Eventually, on September 14, 2020, the Borrower and many of its subsidiaries and affiliates filed for bankruptcy under Chapter 11 of the United States Bankruptcy Code. The multiple entities that filed Chapter 11, each of whom owed obligations and pledged collateral to the Syndicate Lenders, are collectively referred to herein as the "Debtors."

3. At the onset of the pandemic in March 2020, each of the Lender Defendants organized into a group that they self-identified as the "Ad Hoc Term Lender Group." This Ad Hoc Term Lender Group (referred to herein as the Lender Defendants) hired attorneys and financial advisors, engaged in pre-bankruptcy workout negotiations with the Borrower, and actively participated in the Debtors' bankruptcy case.

4. The Credit Agreement and the Security Agreement (collectively, the "Agreements") set forth the agreements, rights and duties among the various parties thereto. Among those agreements, rights and duties are matters relating to the relationship between the Borrower (including its affiliates) and the Syndicate Lenders. Of particular relevance to this action, the Agreements also establish the relative agreements, rights and duties between and among the Syndicate Lenders and between the Agent and the Syndicate Lenders. To that end, the Agreements provide certain **limited** rights to the "Required Lenders" and "Required Secured Creditors" (defined to be any combination of the lenders constituting a majority in dollar amount

of the outstanding loans provided to the Borrower) to take certain actions, or direct the Agent to take certain actions, that will be binding on all Syndicate Lenders. In other words, a group of Syndicate Lenders holding more than 50% of the loans had certain limited rights to take or direct actions under the Agreements.

5.  The Lender Defendants held more than 50% of the loan amounts, and thus constituted the "Required Lenders" and the "Required Secured Creditors" under the Agreements. Using that status, and in violation of the Agreements, the Lender Defendants took unauthorized actions in the Debtors' bankruptcy case that severely damaged the rights and interests of the Syndicate Lenders, including Plaintiffs. At the same time, the Agent also materially breached the Agreements by facilitating, permitting, and/or failing to intervene and prevent the Lender Defendants' unauthorized and harmful actions. The Agent's acts and omissions were the result of the Agent's gross negligence and violated the Agreements.

6.  These breaches are the foundation of this lawsuit. The Lender Defendants, acting as the self-described Ad Hoc Term Lender Group, breached the Agreements by taking actions in the Debtors' bankruptcy case that ultimately resulted in the release of the secured loans and collateral rights in exchange for essentially nothing. Specifically, the Lender Defendants joined up with a third party, Tacit Capital LLC ("Tacit"), to establish a new entity ("NewCo") for the purpose of purchasing the Debtors' assets and operations from the bankruptcy estate. As structured by the Lender Defendants and Tacit, NewCo would be owned in part by the Syndicate Lenders and in part by Tacit. The Lender Defendants believed that they had an agreement whereby (i) NewCo would issue new debt instruments in favor of the Syndicate Lenders and (ii) Tacit would contribute $47.5 million into NewCo to make it a viable, go-forward entity.

7.  In return, the Lender Defendants agreed to contribute to NewCo $80 million of the Syndicate Lenders' approximately $167 million loan, so that NewCo could "credit bid" that

amount as part of its purchase price for the Debtors' assets and operations. The Debtors' assets and operations would be sold to Newco free and clear of the Syndicate Lenders' liens, and thus the only recovery to the Syndicate Lenders on the credit bid portion of their loans would be the value that was to be derived through NewCo. Furthermore, since all of the assets and operations of the Debtors that secured the Syndicate Lenders' loans would be transferred to NewCo, the remaining portion of the Syndicate Lenders' loans that was not part of the credit bid would be rendered essentially worthless.

8. The Agreements did not authorize the Lender Defendants to contribute the $80 million in loans to NewCo. Moreover, in agreeing to the transaction, the Lender Defendants failed to secure binding and enforceable commitments from Tacit and NewCo to provide the Syndicate Lenders with the promised consideration in exchange for the loans. Specifically, the Lender Defendants did not secure an enforceable agreement (i) with NewCo to provide the debt instruments to the Syndicate Lenders or (ii) with Tacit to contribute $47.5 million in capital into NewCo. In addition, the Lender Defendants did not ensure that the sale of the Debtors' assets (*i.e.*, the Syndicate Lenders' collateral) to NewCo was contingent upon the Syndicate Lenders receiving the consideration that the Lender Defendants believed was promised to them. In short, the Lender Defendants gave away the Syndicate Lenders' loans and collateral without receiving a binding commitment to receive *any value* in return.

9. This all took place in the Borrower's bankruptcy case in full view of the Agent, who took no action to stop the Lender Defendants and protect the Syndicate Lenders from the Lender Defendants' violations of the Agreements. Simply put, the Agent sat and did nothing. As a result of the Defendants' conduct, the recovery value to the Syndicate Lenders, including the Plaintiffs, on the secured loans to the Borrower has been destroyed.

10. When the Lender Defendants finally realized that Tacit's promises would not be

met, the Lender Defendants sought emergency relief from the bankruptcy court to stop the sale transaction. To this end, the Lender Defendants filed a remarkable motion in the bankruptcy court (the "Emergency Sale Motion") that set forth in extensive detail the ways in which the Lender Defendants breached the Agreements. In the Emergency Sale Motion, the Lender Defendants admit that they are not authorized under the Agreements to credit bid the loans, that they failed to secure enforceable agreements with Tacit (instead, having nothing more than an informal email exchange with bracketed numbers), and that their conduct had resulted in an exchange of the Lender Syndicate's valuable secured loans for, in their own words, "zero recovery." The Emergency Sale Motion is, in essence, a confession by the Lender Defendants to the contractual breaches that Plaintiffs seek to remedy by this lawsuit. The bankruptcy court summarily rejected the Lender Defendants' effort to stop (i) the credit bid of the Syndicate Lenders' loans to the Debtors and (ii) the sale of the Debtors' assets to NewCo.

11. As a result of the Defendants' breaches, NewCo purchased the Debtors' assets and operations—the Syndicate Lenders' collateral—free and clear of the Syndicate Lenders' liens. Due to the Lender Defendants' actions, the Syndicate Lenders' loan repayment rights were relinquished. In exchange, the only consideration received by the Syndicate Lenders was the right to obtain 20% of the equity in NewCo, with Tacit and its partners owning the remaining 80%. NewCo did not receive the $47.5 million in cash that the Lender Defendants believed Tacit would contribute, instead receiving only $5 million, thus leaving NewCo's value and viability so impaired that it would be, in the words of the Lender Defendants, "destined for a quick return to the bankruptcy court." NewCo also did not issue the new debt instruments in favor of the Syndicate Lenders.

12. The bottom line is that the Defendants' conduct rendered Plaintiffs' secured loans essentially worthless and, as Lender Defendants themselves stated, resulted in "an exchange of

their entire prepetition loan in exchange for zero recovery." This action seeks to hold the Defendants accountable for their contractual breaches and the resulting damages to Plaintiffs.

## PARTIES

### PLAINTIFFS

13. Plaintiff Kennedy Lewis Partners Master Fund LP is a Cayman Islands limited partnership with its principal place of business in New York, NY.

14. Plaintiff Kennedy Lewis Partners Master Fund II LP is a Cayman Islands limited partnership with its principal place of business in New York, NY.

### DEFENDANTS

15. Defendant Abry Partners is a Delaware limited liability company with its principal place of business in Boston, MA.

16. Defendant Apex Credit Partners, LLC, is a Delaware limited liability company with its principal place of business in New York, NY.

17. Defendant CIFC Asset Management LLC, for and on behalf of funds managed and/or advised by it, is a Delaware limited liability company with its principal place of business in New York, NY.

18. Defendant Ellington Management Group, L.L.C., on behalf of certain funds and accounts, is a Delaware limited liability company with its principal place of business in Old Greenwich, CT.

19. Defendant Trimaran Advisors Management, L.L.C., is a Delaware limited liability company with its principal place of business in New York, NY.

20. Defendant Wilmington Savings Fund Society, FSB, is a federal savings bank with its principal place of business in Wilmington, Delaware.

## JURISDICATION AND VENUE

21. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334. This action is related to the Debtors' Chapter 11 proceeding pursuant to 28 U.S.C. § 1334(b).

22. Section 13.08 of the Credit Agreement provides that "ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT SHALL BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK, IN EACH CASE WHICH ARE LOCATED IN THE COUNTY OF NEW YORK, BOROUGH OF MANHATTAN…."

23. This Court has personal jurisdiction over each of the Defendants because each consented to jurisdiction pursuant to Section 13.08 of the Credit Agreement, and because, on information and belief, Defendants are residents of New York and/or conduct business within the State of New York and have regularly and systematically transacted and/or solicited business in this State, either directly or through intermediaries, have derived substantial revenue for services rendered in New York, and/or have purposely availed themselves of the benefits of the State of New York.

24. Venue in this district is proper pursuant to Section 13.08 of the Credit Agreement and 28 U.S.C. § 1391.

I.   **Relevant Facts**

25. As of December 31, 2019, the Borrower, along with its parents, subsidiaries and affiliates, operated 186 fitness clubs under various brand names, collectively serving approximately 605,000 members. The Borrower's clubs and brands included New York Sports Clubs, Boston Sports Clubs, Washington Sports Clubs and Philadelphia Sports Clubs, among others.

26. The Borrower, the Syndicate Lenders, and the Agent, among others, are parties to that certain credit agreement dated as of November 15, 2013 (as amended, restated, supplemented, or otherwise modified, the "Credit Agreement"), which is attached hereto as **Exhibit 1**. The Credit Agreement provided the Borrower with a $340 million senior secured credit facility, a portion of which matured on August 14, 2020 and another portion of which matured on November 15, 2020.

27. The Borrower and the Agent, among others, are also parties to that certain security agreement dated November 15, 2013 (as amended, restated, supplemented, or otherwise modified, the "Security Agreement"), which is attached hereto as **Exhibit 2**. Pursuant to the Security Agreement, and other related documents (collectively, the "Security Documents"), the borrowings under the Credit Agreement are guaranteed and secured by, among other things, the assets and operations of the Debtors.

28. Pursuant to the Credit Agreement, the Lender Defendants, who constitute the Required Lenders, can take certain limited actions and direct the Agent to take certain limited actions that bind all of the Syndicate Lenders. Specifically, Section 12.10(a) of the Credit Agreement provides (emphasis added):

> Each Lender hereby agrees … except as otherwise set forth herein, any action taken by the Required Lenders … or the Collateral Agent (at the direction of the Required Lenders …) **in accordance with the provisions of this Agreement or the Security Documents**, and the exercise by the Required Lenders … or the Collateral Agent (at the direction of the Required Lenders …) **of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto**, shall be authorized and binding upon all of the Lenders.

29. The Security Agreement in Section 7.1 further provides that only the Agent, acting in its capacity as the collateral agent, can enforce the Security Agreement and realize upon the security granted by the Security Agreement, including pursuant to a credit bid (emphasis added):

8

> By accepting the benefits of this Agreement and each other Security Document, the Secured Creditors [i.e., Syndicate Lenders] expressly acknowledge and agree that this Agreement and each other Security Document may be enforced **only by the action of the Collateral Agent acting upon the instructions of the Required Secured Creditors** [i.e., Required Lenders] and that no other Secured Creditor [i.e., Syndicate Lender] shall have the right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby …

30. Finally, Section 13.12(a) does not permit the Required Lenders or the Agent to "release all or substantially all of the Collateral (except as expressly provided in the Credit Documents) under all the Security Documents" without the consent of all of the Syndicate Lenders. Defendants breached each of these Sections of the Agreements.

31. In March 2020, the COVD-19 pandemic caused the closure of all of the Borrower's clubs. At that time, the Lender Defendants agreed among themselves to act as a so called "ad hoc group" in order to constitute the "Required Lenders" under the Credit Agreement and thus guarantee to themselves a significant level of control over any future workout negotiations and/or resolution relating to the Borrower and the loans. Acting as this ad hoc group, the Lender Defendants retained outside counsel and a financial advisory firm. Plaintiffs, as the single largest holder of secured debt to the Borrower with over 45% of the outstanding loans, also engaged with the Borrower to explore workout options.

32. The parties' efforts were not successful, and the Borrower filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 20-12168 before Chief Judge Christopher S. Sontchi. In the bankruptcy proceedings, the Lender Defendants and Plaintiffs each continued to engage with the Borrower, both offering to provide or arrange debtor-in-possession ("DIP") financing to the Borrower. Despite the Borrower's preference for Plaintiffs' proposed financing, the Borrower stated that it had no option other than to accept the Lender Defendants' proposal because of their status as Required Lenders under the Credit Agreement. In their filings and otherwise, the Lender Defendants made

clear to the Bankruptcy Court, the Debtors and Plaintiffs that Plaintiffs were powerless under the Agreements, and that only the Lender Defendants (as the Required Lenders) could act, or give directions to the Agent to act, under the Agreements. Throughout the bankruptcy, the Lender Defendants kept Plaintiffs in the dark about their actions. Except as disclosed in the parties' court filings, Plaintiffs did not know what the Lender Defendants or the Agent were doing on their behalf. Plaintiffs did not know that the Lender Defendants were violating the Agreements and were exceeding the authority granted to them under the Agreements.

33. In arranging their DIP financing proposal, the Lender Defendants teamed up with Tacit. As part of this arrangement, the Lender Defendants and Tacit formed NewCo in order to purchase the assets and operations of the Debtors. The Lender Defendants arranged to have an affiliate of Tacit provide $32 million in DIP financing to fund the Debtors' bankruptcy case, including an auction process for the sale of the Debtors' assets and operations. The DIP financing was conditioned on Newco being the "stalking horse bid" in the auction, wherein NewCo would credit bid $80 million of the Syndicate Lenders' secured loans to the Debtors as part of its purchase price.

34. The Lender Defendants believed that they had an agreement with Tacit and NewCo relating to the funding of NewCo and the recoveries to be received by the Syndicate Lenders. Under that presumed agreement, in exchange for contributing the $80 million secured loan amount to the purchase of the Debtors' assets and operations, (i) the Syndicate Lenders would receive 20% of the equity of Newco; (ii) NewCo would issue new debt to the Syndicate Lenders in the amount of at least $35 million; and (iii) Tacit would contribute $47.5 million in cash to NewCo to make it a viable, go forward entity. This presumed agreement was illusory, as the Lender Defendants failed to obtain any binding and enforceable commitments from Tacit or NewCo regarding the new debt instruments or the $47.5 million capital infusion in NewCo.

35.  The Debtors and NewCo did, however, enter into an Asset Purchase Agreement pursuant to which NewCo agreed to credit bid the $80 million of secured loans as part of the purchase price for the Debtors' assets and operations.  The Lender Defendants directly participated in the negotiations of the Asset Purchase Agreement and wrongfully committed the Syndicate Lenders to this credit bid without authorization under the Agreements.  No other offers were received for the Debtors' assets, and thus the auction was canceled and NewCo was declared the successful bidder.

36.  The Bankruptcy Court held a hearing on November 3, 2020 at which it approved the sale of the Debtors' assets and operations to NewCo pursuant to the Asset Purchase Agreement.  In paragraph X of the order approving the sale ("Sale Order"), the Bankruptcy Court held:

> NewCo is a Delaware corporation that was formed on behalf of the Prepetition Lenders … and New Town Sports Holdings, LLC ("Sponsor"), and upon the Closing Date will be owned by the Prepetition Lenders and Sponsor, in accordance with the terms of the Asset Purchase Agreement.  Pursuant to the terms of the Asset Purchase Agreement and [the Court's order on the DIP, the ("DIP Order")], the Prepetition Lenders are secured creditors of the Debtors, holding allowed Claims … secured by valid, binding, perfected, and enforceable first-priority security interests in and liens against each of the Debtors, their estates and the property of their estates of which $80,000,000.00 of such … will be credit bid in connection with the Sale [the "Credit Bid Consideration"]….  The Prepetition Agent (as defined in the DIP Order), on behalf of the Prepetition Lenders, has the right under section 363(k) of the Bankruptcy Code and is authorized by this Court pursuant to the Bid Procedures Order and this Sale Order, to credit bid the Credit Bid Consideration.  Pursuant to the Asset Purchase Agreement, the Buyers agreed to provide, as consideration for the Acquired Assets, the Purchase Price, which includes, among other things, the Credit Bid Consideration.

37.  The Sale Order approved the sale of the Debtors' assets and operations to NewCo pursuant to the Asset Purchase Agreement and finalized the $80 million credit bid of the secured loans as part of NewCo's purchase price for the sale.

38.  Thereafter, Tacit backed out of its alleged promises to contribute $47.5 of capital to NewCo and for NewCo to issue new debt instruments to the Syndicate Lenders.  Instead, two

other entities stepped in for Tacit and committed only $5 million of capital to NewCo in order to finance the sale transaction with the Debtors. Realizing the gravity of the situation that they had created, the Lender Defendants filed their Emergency Sale Motion to try to stop the credit bid of the secured loans and the sale of the Debtors' assets to NewCo.

39.     In the Emergency Sale Motion, the Lender Defendants admitted that, "[a]s part of the Sale, the Ad Hoc Term Lender Group [*i.e.*, the Lender Defendants] agreed that its prepetition debt could be used as currency in the sale process." At the same time, citing Section 7.1 of the Security Agreement, the Lender Defendants admitted that they were not authorized to credit bid the loans to NewCo and the Debtors.

40.     The Lender Defendants also argued that "Tacit agreed in the initial global deal to capitalize the Buyer with a cash contribution of $47.5 million to ensure its viability as a go-forward entity," and that "the parties explicitly agreed on the steps necessary to effectuate the Sale transaction, including that [NewCo] would acquire $80 million in loans from the Prepetition Lenders in exchange for equity in the ultimate parent of [NewCo] and newly issued takeback debt." However, the only support for this alleged "explicit agree[ment]" on the issuance of takeback debt was an email exchange between the parties referencing bracketed numbers.

41.     The Lender Defendants made clear in the Emergency Sale Motion that their actions had created a disastrous result for the Syndicate Lenders. As the Lender Defendants stated, "the outcome of the Sale closing … will foreclose any recovery by the Prepetition Lenders and facilitate the establishment of an uncapitalized [NewCo]." The Lender Defendants also admitted that they had caused "an exchange of their entire prepetition loan in exchange for zero recovery."

42.     The Debtors opposed the Emergency Sale Motion and showed how the Lender Defendants had been actively involved in all aspects of the DIP Financing, sale process, and

Asset Purchase Agreement, and had committed the Syndicate Lenders to the credit bid at every step. At the same time, the parties' filings established that the Agent was absent from the process and never objected to any aspect of what the Lender Defendants were doing, including the commitments by the Lender Defendants in the public bankruptcy filings to credit bid the loans.

43. As the Lender Defendants concede in their Emergency Sale Motion, the Lender Defendants were not authorized to make the credit bid. But that is exactly what the Lender Defendants did and the Agent did nothing about it despite being on notice of it.

44. The Bankruptcy Court conducted a hearing on the Emergency Sale Motion and held:

> I think that the sale order makes it clear that the preliminaries, i.e. the transfer of the right to credit bid, have already occurred and we're not awaiting that happening. I think it's actually quite reasonable to reach the resolution that this happened at the APA.… [A]nd to the extent that it didn't already occur pursuant to some sort of documents being exchanged among the parties I deemed it as a matter of law and to the extent I have to exercise equitable power here it did occur. So, I am finding that [NewCo] has the authority to credit bid. You can go to closing and [NewCo] can credit bid the debt. I think that is consistent with the documents. It's certainly consistent with the course of dealing.

45. After the hearing, the Bankruptcy Court entered its order denying the Emergency Sale Motion "for the reasons set forth on the record; and (ii) pursuant to paragraph X of the Sale Order, the Prepetition Agent, on behalf of the Prepetition Lenders, has transferred the right to credit bid the Credit Bid Consideration to [NewCo], and [NewCo] is authorized to contribute the Credit Bid Consideration at closing of the sale." In other words, the Lender Defendants committed the Agent to credit bid the loans, and even though the Agent was aware of this and knew that it did not in fact do so, the Agent took no action to stop the Lender Defendants and protect the Syndicate Lenders.

46. As authorized by the Bankruptcy Court's order, NewCo "paid" $80 million of the

secured loans as part of its purchase price and the sale transaction closed on November 30, 2020. In return, each of the Syndicate Lenders received only the right to obtain their pro rata portion of 20% of the equity of NewCo, a severely undercapitalized health club operator fighting to survive in a pandemic environment and requiring significant capitalization. By December 29, 2020, according to NewCo, Plaintiffs' share of the value of the equity that could be obtained in NewCo was only approximately $45,000. Thus, $80 million in secured debt owing by the Borrower to Plaintiffs became virtually worthless and unrecoverable as a result of Defendants' breaches of the Agreements. Plaintiffs seek by this complaint to hold the Defendants accountable for these breaches and the resulting damages to Plaintiffs.

**II.    First Cause of Action – Breach of Section 12.10 of the Credit Agreement and Section 7.1 of the Security Agreement by the Lender Defendants**

47.    Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 46 of this complaint as if fully set forth herein.

48.    The Agreements constitute valid and enforceable contracts between and among Plaintiffs, the Lender Defendants, and the Agent.

49.    Plaintiffs have performed all obligations required of them under the Agreements.

50.    Section 12.10 of the Credit Agreement authorizes the Lender Defendants, as the Required Lenders, to take certain limited actions that are in accordance with the Agreements that bind the Syndicate Lenders. Specifically, Section 12.10(a) states (emphasis added):

> Each Lender hereby agrees … except as otherwise set forth herein, any action taken by the Required Lenders … or the Collateral Agent (at the direction of the Required Lenders …) **in accordance with the provisions of this Agreement or the Security Documents**, and the exercise by the Required Lenders … or the Collateral Agent (at the direction of the Required Lenders …) **of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto**, shall be authorized and binding upon all of the Lenders.

51.    Section 7.1 of the Security Agreement grants exclusive authority to the Agent, in its capacity as collateral agent, to enforce and realize upon the Syndicated Lenders' security.

Specifically, Section 7.1 provides (emphasis added):

> By accepting the benefits of this Agreement and each other Security Document, the Secured Creditors [*i.e.*, Syndicate Lenders] expressly acknowledge and agree that this Agreement and each other Security Document may be enforced **only by the action of the Collateral Agent acting upon the instructions of the Required Secured Creditors** [*i.e.*, Required Lenders] and that no other Secured Creditor [*i.e.*, Syndicate Lender] shall have the right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby …

52. As detailed at length in the preceding paragraphs, each of the Lender Defendants acting in a collective manner breached these provisions of the Agreements. The Lender Defendants did not have the authority to transfer and/or credit bid, or commit the Agent to transfer and/or credit bid, any loan amounts to NewCo, the Debtors, or any other person.

53. As a result of these breaches, the Plaintiffs have lost tens of millions of dollars. Specifically, the Lender Defendants extinguished the Syndicate Lenders', including Plaintiffs', $80 million secured loan repayment and collateral rights in exchange for the right to obtain minority equity in a woefully undercapitalized NewCo. This minority equity for Plaintiffs was worth a mere $45,000 as of December 29, 2020. As the Lender Defendants admitted, their conduct "foreclose[d] any recovery by the [Syndicate Lenders]" and caused "an exchange of their entire prepetition loan in exchange for zero recovery." The damages suffered by the Plaintiffs due to the breaches of the Agreements by each of the Lender Defendants will be proven at trial of this matter.

### III.     Second Cause of Action – Breach of Sections 12.02 and 12.10 of the Credit Agreement and Section 7.1 of the Security Agreement by the Agent

54. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 53 of this complaint as if fully set forth herein.

55. The Agreements constitute valid and enforceable contracts between and among Plaintiffs, the Lender Defendants, and the Agent.

56. Plaintiffs have performed all obligations required of them under the Agreements.

57. Section 12.10 of the Credit Agreement authorizes the Agent, at the direction of the Required Lenders, to take certain limited actions that are in accordance with the Agreements that bind the Syndicate Lenders. Specifically, Section 12.10(a) states (emphasis added):

> Each Lender hereby agrees … except as otherwise set forth herein, any action taken by the Required Lenders … or the Collateral Agent (at the direction of the Required Lenders …) **in accordance with the provisions of this Agreement or the Security Documents**, and the exercise by the Required Lenders … or the Collateral Agent (at the direction of the Required Lenders …) **of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto**, shall be authorized and binding upon all of the Lenders.

58. Section 7.1 of the Security Agreement grants exclusive authority to the Agent, in its capacity as collateral agent, to enforce and realize up the Syndicated Lenders' security. Specifically, Section 7.1 provides (emphasis added):

> By accepting the benefits of this Agreement and each other Security Document, the Secured Creditors [*i.e.*, Syndicate Lenders] expressly acknowledge and agree that this Agreement and each other Security Document may be enforced **only by the action of the Collateral Agent acting upon the instructions of the Required Secured Creditors** [i.e., Required Lenders] and that no other Secured Creditor [i.e., Syndicate Lender] shall have the right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby …

59. Section 12.02(a) of the Credit Agreement provides that the Administrative Agent shall have the duties set forth in the Agreements and shall be liable for "any action taken or omitted by it … caused by its … gross negligence or willful misconduct." Similarly, Section 12.10(c) provides that the "Collateral Agent shall have no duty or liability whatsoever to the [Syndicate] Lenders, except for its gross negligence, willful misconduct or material breach (as determined by a court of competent jurisdiction in a final and non-appealable decision)."

60. The Agent breached these provisions by allowing the Lender Defendants to exceed their authority by transferring the secured loans to NewCo and the Debtors, resulting in

the Bankruptcy Court holding that the Agent transferred Syndicate Lenders' secured loans on behalf of the Lender Defendants. Despite being on notice, the Agent did not act to stop the Lender Defendants from breaching the Agreements or prevent the Bankruptcy Court from reaching this conclusion. By standing by and doing nothing to prevent the transfer of the Syndicate Lenders' secured loans, the Agent was grossly negligent and materially breached the agreements.

61. In the alternative, if it is determined that the Agent, whether as a matter of law or fact, itself transferred the secured loans to NewCo and the Debtors (rather than the Lender Defendants), then the Agent breached Sections 12.02 and 12.10 of the Credit Agreement. Specifically, the Agent was grossly negligent and materially breached the Agreements by transferring the Syndicate Lenders' valuable secured loans to NewCo in exchange for virtually nothing.

62. As a result of these breaches, the Plaintiffs have lost tens of millions of dollars. Specifically, the Syndicate Lenders', including Plaintiffs', $80 million secured loan repayment and collateral rights were extinguished in exchange for the right to obtain minority equity in a woefully undercapitalized NewCo. This minority equity was worth a mere $45,000 as of December 29, 2020. As the Lender Defendants admitted, this "foreclose[d] any recovery by the [Syndicate Lenders]" and caused "an exchange of their entire prepetition loan in exchange for zero recovery." The damages suffered by the Plaintiffs due to the breaches of the Agreements by the Agent will be proven at trial of this matter.

IV. **Third Cause of Action – Breach of the Section 13.12 Credit Agreement by All Defendants**

63. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 62 of this complaint as if fully set forth herein.

64. The Agreements constitute valid and enforceable contracts between and among

Plaintiffs, the Lender Defendants, and the Agent.

65. Plaintiffs have performed all obligations required of them under the Agreements.

66. Section 13.12(a) of the Credit Agreement provides that there may not be any "change, waiver, discharge or termination" to the Agreements "without the consent of each Lender" that "release all or substantially all of the Collateral (except as expressly provided in the Credit Documents) under all the Security Documents."

67. The Lender Defendants, and alternatively the Agent, breached this provision by transferring $80 million in loan amount to NewCo and the Debtors without the consent of Plaintiffs. By transferring this loan amount to NewCo and the Debtors, the Lender Defendants, and alternatively the Agent, effectively amended the Credit Agreement to release the Syndicate Lenders' collateral, to which the Plaintiffs never consented.

68. Accordingly, the Lender Defendants, and alternatively the Agent, breached Section 13.12 of the Credit Agreement by releasing the collateral without Plaintiffs' consent.

69. As a result of these breaches, the Plaintiffs have lost tens of millions of dollars. Specifically, the Syndicate Lenders', including Plaintiffs', $80 million secured loan repayment and collateral rights were extinguished in exchange for the right to obtain minority equity in a woefully undercapitalized NewCo. This minority equity was worth a mere $45,000 as of December 29, 2020. As the Lender Defendants admitted, this "foreclose[d] any recovery by the [Syndicate Lenders]" and caused "an exchange of their entire prepetition loan in exchange for zero recovery." The damages suffered by the Plaintiffs due to the breaches of the Agreements by each of the Lender Defendants, and alternatively the Agent, will be proven at trial of this matter.

## V. Prayer for Relief

70. Plaintiffs respectfully request judgment against Defendants, granting Plaintiffs the following relief:

i. Actual, compensatory, and consequential damages in an amount to be proven;

ii. Pre-judgment and post-judgment interest;

iii. Reasonable attorneys' fees, costs, and expenses incurred in this action; and

iv. Any other and further relief as the Court deems just, proper, or equitable under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues so triable.

Dated: New York, New York
May 25, 2021

McKool Smith, P.C.

By: */s/ Kyle A. Lonergan*
Kyle A. Lonergan
(klonergan@mckoolsmith.com)
James H. Smith
(jsmith@mckoolsmith.com)
One Manhattan West, 50th Floor
395 9th Avenue
New York, NY 10001
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

John Sparacino (to be admitted *pro hac vice*)
(jsparacino@mckoolsmith.com)
600 Travis St # 7000
Houston, TX 77002
Telephone: (713) 485-7300
Facsimile: (713) 485-7344